434 So.2d 395 (1983)
STATE of Louisiana
v.
Frank D. EDWARDS.
No. 82-KA-0631.
Supreme Court of Louisiana.
June 27, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul Carmouche, Dist. Atty., Robert W. Gillespie, Jr., William Giddens, Asst. Dist. Attys., for plaintiff-appellee.
Richard C. Goorley, Jeanette G. Garrett, Shreveport, for defendant-appellant.
*396 BLANCHE, Justice.
Defendant Frank Edwards was charged with first degree murder, a violation of LSA-R.S. 14:30, for the stabbing death of Claude Moore. He was subsequently convicted by a twelve-member jury of manslaughter, a violation of LSA-R.S. 14:31. At sentencing, the defendant pleaded guilty to a multiple bill establishing him as a second felony offender and was sentenced to 21 years at hard labor, one-half of the statutory maximum. See LSA-R.S. 15:529.1(A)(1). In urging reversal of his conviction and sentence, the defendant argues two of the four errors assigned with the trial court.
The body of the victim, stabbed as many as 34 times, was discovered by one of the defendant's neighbors as he left for work at about 6:30 a.m. on June 21, 1979. The body lay face down in the front yard of a Shreveport, Louisiana home, and a trail of relatively fresh blood ran from the body to the steps of the defendant's garage apartment which was located to the rear of the house. Investigating officers knocked at the door, and the defendant appeared clad only in a pair of blood-stained boxer shorts. From their vantage point at the open door, the officers observed the blood-spattered interior of the apartment and immediately placed the defendant and his live-in girlfriend under arrest and warned them of their Miranda rights. After a cursory walk-through to ensure the presence of no other persons or victims, the officers left and sealed off the area.
At the station house, a Shreveport police detective read to the defendant a consent to search form and explained that the police wanted to search his apartment. In the presence of two officers who served as witnesses, the defendant acknowledged that he understood the nature of their request and executed the consent form. The subsequent search uncovered a great deal of physical evidence, including the defendant's clothing which had been soaked with the victim's blood and the butcher knife used to kill the victim. The defendant agreed to give a statement and admitted to stabbing the victim, but asserted that he had done so during a fight which had erupted when the victim propositioned his live-in girlfriend.

ASSIGNMENT OF ERROR NO. 3
By this assignment, the defendant argues that the trial court erred in denying his motion to suppress as evidence items seized from and photographs taken in his apartment. Specifically, he urges that his consent to search had not been given freely and voluntarily because he had not been adequately informed of his right to refuse the search and that, at any rate, he was so intoxicated at the time that he could not have understood what he was doing.

1.
The defendant bases his intoxication argument on a blood test which was taken at 12:38 p.m. on June 21, 1979, some ten hours or so after the stabbing and five hours after the consent form was signed, which showed his blood alcohol level to be .20, twice the level at which the law presumes intoxication in DWI cases. By a process called "back calculating," a criminal lab technician estimated the defendant's blood alcohol level at between .275 and .325 at the approximate time the consent form had been executed. At the hearing on the motion to suppress, the technician testified that an alcohol level of that amount would probably cause substantial physical and mental impairment in the ordinary person. However, on cross-examination, he conceded that the degree of impairment depended in large degree upon the individual person's drinking habits. He conceded further that he knew nothing of the defendant's drinking habits and that he had personally drawn blood from persons with blood alcohol levels in excess of .35 who still had cognitive and motor function.
The defendant testified that he did not recognize the consent form when it was shown to him at the hearing, although he did recognize his signature. Interestingly, our review of the record shows that the defendant has recalled with a remarkable degree of clarity the circumstances surrounding his arrest; his memory became "fuzzy" only when questioned as to the *397 circumstances surrounding his execution of the consent form. At the hearing, the defendant recalled being advised of his rights at the station and executing the Miranda rights form. This occurred just minutes before his execution of the consent form, and our review of the two forms, executed within minutes of each other, shows that the signatures on each are not so dissimilar that one might be able to infer a diminished capacity when the consent form was executed.
The arresting officer testified that the defendant smelled of alcohol at the time of his arrest but had no trouble negotiating the steps from the upstairs apartment. Moreover, the defendant acknowledged and appeared to understand his Miranda rights as they were explained to him. The officer stated that the defendant appeared surprised when he was told that he was being arrested for homicide and added that the defendant walked normally and was able to get into the police vehicle by himself, even though his hands were cuffed behind his back. The officer testified that the primary indicia of alcoholic consumption was the outward odor rather than any apparent mental or physical impairment. Another of the officers present at the arrest testified that the defendant's motor movements were "fine" and his speech was not slurred. He stated, "[R]eally the only thing that led me to believe that he had been drinking was the strong smell of alcohol."
Still further, Detective Brann, who read to the defendant the consent form at the station house, testified that the defendant was read his Miranda rights and executed an acknowledgment that he understood them. The officer testified that he could smell "stale wine" on the defendant, but the defendant did not appear to be drunk:
Q. "Did he appear to understand what you were talking about?
A. Yes.
Q. Did he have any trouble speaking to you?
A. No.
Q. Was his voice slurred?
A. No. This was the first time I had ever met the gentleman, and he appeared, like I said, except for the odor of alcohol, he appeared to be okay to me.
Q. Did hedid he seem to understand the consent to search form?
A. Yes.
Q. Did he sign that in your presence?
A. Yes. He initialed it and signed it.
Q. Okay. You made him initial it?
A. Yes. There was section that has a paragraph here explaining what was to be searched, the right to a search warrant, et cetera. And we had him initial the paragraph, top and bottom."
* * * * * *
Brann testified further that, absent the smell of alcohol, he would not have suspected the defendant of DWI had he stopped him while driving. As a foundation for that testimony, the detective related that he had made about three dozen DWI arrests during his police career. In response to questioning from the bench, Brann testified that no threats, abuse, or inducements were used in order to obtain the defendant's consent. The other officer who witnessed the defendant's execution of the consent form, Detective Mixon, affirmed that testimony and testified that, except for a strong smell of alcohol, the defendant did not appear to be impaired mentally or physically.
A valid consent search is a well recognized exception to the warrant requirement, but the burden is upon the state to prove that the consent was given freely and voluntarily. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances of each case. These factual determinations are to be given great weight on appellate review. State v. Smith, 433 So.2d 688 (La. 1983) (82-KA-0924); State v. Ludwig, 423 So.2d 1073 (La.1982); State v. Yarbrough, 418 So.2d 503 (La.1982). In our view, the trial judge analyzed properly the totality of the circumstances in this case and properly determined that the defendant's consent to *398 search had been given freely and voluntarily, despite the relatively high blood alcohol level revealed by the blood test.
We expressly reject the argument that an intoxication level beyond that established as presumptive of intoxication for purposes of our DWI laws (LSA-R.S. 32:662) renders an otherwise validly obtained consent per se involuntary or somehow raises the burden of the state beyond a showing that the consent was given freely and voluntarily. Degree of intoxication is but one of the circumstances to which the trial judge must look in assessing the voluntariness of the consent to search. State v. Ludwig, supra; State v. Strange, 334 So.2d 182 (La.1976).
The defendant in this case has displayed a selective memory of the events surrounding his execution of the consent to search form. However, the testimony of the other witnesses leaves little doubt that the defendant was not so intoxicated that he did not understand the import of his actions in executing the consent form. Our review of the defendant's medical history, part of the record in this case, shows him to be a persistent alcoholic. In view of the expert testimony adduced at the hearing on the motion to suppress as to the relationship between the degree of impairment and the particular drinking habits of the individual, we cannot say that the trial court abused its great discretion in ruling that the defendant's blood alcohol level did not vitiate the voluntariness of his consent to search.

2.
The defendant also asserts that the conflicting testimony of Detectives Brann and Mixon regarding exactly which portions of the consent form were read to him before he signed it demonstrates that he was not adequately informed of his right to refuse the search. Specifically, the defendant urges that their conflicting testimony cast such doubt upon their credibility that the trial court erred in finding that his consent had been given freely and voluntarily.
Officer Brann testified that he placed the consent form in front of the defendant and read the entire form aloud with him. Brann stated further that:
* * * * * *
"[I] told him that the Shreveport Police wanted to search his residence. If he wanted to assist us and save us the time of seeking a search warrant, we had this form for consent for search and seizure. And we could go on this route, or I'd notify them, and then one of them could come in and get a search warrant. And he agreed to fill out this form."
* * * * * *
Moreover, the last paragraph of the consent form which Brann testified that he read to the defendant in its entirety specifically advised the defendant of his right to refuse the search:
* * * * * *
"I AM GIVING THIS WRITTEN PERMISSION to these OFFICERS freely and voluntarily without any threats or promises having been made to me and after having been informed by these OFFICERS that I have the right to refuse to permit this search and seizure. It is my desire to assist the OFFICERS in their investigation by saving them the extra time it would take to obtain a search warrant, and for this reason I have given my permission."
Brann testified that Mixon was present during the reading of the entire form but that Mixon advised him afterward to cross out the bottom paragraph since he (Mixon) had been advised by the District Attorney's office that the paragraph should no longer be used. Officer Brann then testified that Mixon himself crossed out the last paragraph and marked it "N/A", meaning "not applicable." Mixon also testified that it had been he who crossed out the last paragraph and marked it "N/A"; however, he testified that he did so before Brann read the form to the defendant.
Although there appears to be some conflict between the testimony of Brann and Mixon as to whether the entire consent form was read to the defendant before it was executed, we do not find the *399 discrepancy significant enough to cast a shadow of doubt long enough to vitiate the voluntariness of the defendant's consent. Failure of the authorities to specifically advise the defendant of his right to refuse the search is but one factor to be weighed by the trial court in analyzing the totality of the circumstances in determining voluntariness. cf. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Hudson, 404 So.2d 460 (La. 1981); State v. Bourgeois, 388 So.2d 359 (La.1980). In our view, analysis of the overall circumstances under which the defendant gave his consent supports the trial court's conclusion that the consent was given freely and voluntarily. Accordingly, we find no abuse of discretion in the trial court's denial of the motion to suppress.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 4
By this assignment, the defendant argues that his 21 year sentence is excessive and not adequately supported by the trial judge's statement of his sentencing reasons. See La.C.Cr.P. art. 894.1.
Our review of the record shows that the defendant pleaded guilty to being a second felony offender in exchange for the 21 year sentence:
THE COURT: "[I] have already told your lawyer that if you pled guilty [to the multiple bill] in this matter, I was going to give you 21 years, and he told you that, did he not?
THE DEFENDANT: Yes, sir.
THE COURT: All right, sir. I want to be sure we understood that."
In several recent cases, we have held that a defendant who accepts a sentence under a plea bargain may not later assert that the sentence is excessive or that the trial judge failed to comply adequately with the sentencing guidelines of La.C.Cr.P. art. 894.1 in imposing sentence. cf. State v. Bell, 412 So.2d 1335 (La.1982); State v. Washington, 406 So.2d 191 (La.1981); State v. Curry, 400 So.2d 614 (La.1981). Nevertheless, this persuasive line of jurisprudence aside, our review of the record shows evidence which "clearly illumines" the judge's sentencing choice; moreover, the trial judge gave particular consideration to these factors in his sentencing colloquy. See State v. Williams, 397 So.2d 1287 (La.1981). He took into account four previous battery convictions, one of which was a conviction for aggravated battery involving a knife. He also took into consideration the defendant's alcoholism, his state of intoxication at the time of the offense, and the provocative circumstances under which the killing occurred. Given the brutal nature of this offense and the criminal propensities of the defendant, we do not find the 21 year sentence unconstitutionally excessive.
This assignment is without merit.

DECREE
For these reasons, the conviction and sentence of the defendant, Frank Edwards, are affirmed.