449 So.2d 1109 (1984)
STATE of Louisiana
v.
Ronnie BEARDEN and Edwardo Arroyo.
No. 83-KA-714.
Court of Appeal of Louisiana, Fifth Circuit.
April 9, 1984.
Writ Denied June 15, 1984.
*1112 William C. Credo, III and David C. Loeb, Asst. Dist. Attys., Gretna, for plaintiff/appellee.
Raleigh Ohlmeyer & G. Fred Ours, New Orleans, for defendants/appellants.
Before BOWES, GAUDIN and DUFRESNE, JJ.
BOWES, Judge.
Defendants, Ronnie E. Bearden, and Edwardo (Eduardo) Arroyo both pled guilty to possession with intent to distribute methaqualone. Arroyo additionally pled guilty to a second count, possession of cocaine (no amount designated). Both defendants reserved their rights to appeal the trial court's denial of their joint motion to suppress pursuant to State v. Crosby, 338 So.2d 584 (La.1976).
Bearden was given a three year sentence (without hard labor), which was suspended, and then placed on active probation for five years and fined $2,500.00 as a special condition of probation.
Arroyo was sentenced to five years at hard labor (suspended) on count two and, on count one, a concurrent five years at hard labor. This sentence was also suspended and he, too, was placed on active probation for five years. However, as a special condition of his probation, Arroyo was condemned to serve two years in the Jefferson Parish Correctional Center (reviewable in one year) and additionally he was ordered to pay a fine of $10,000.00. The defendants were also ordered to pay the costs of court.
On this appeal, we affirm the denial of the motion to suppress by the trial court as to both defendants.
On November 30, 1982, Lieutenant Anthony Soto of the Jefferson Parish Sheriff's office received a phone call from a previously-reliable, confidential informant (C.I.). The C.I. advised Lt. Soto that the defendant Bearden was in possession of a large quantity of Quaaludes (methaqualone) at his residence and, at approximately 7:00 p.m., an unknown subject (no description available) would go to the Bearden home to make a buy.
Based upon this information, Lt. Soto, accompanied by four other officers, established surveillance of the Bearden home and, at about 7:30 p.m., observed a subject later identified as John Nicotra arrive at the house in his red Corvette. He went inside the Bearden house, stayed about ten minutes, and then departed. Three officers, including Lt. Soto, followed the Corvette and, when they were some distance from Bearden's home, pulled the vehicle over and ordered Nicotra out of the car. While conducting a "pat down" for concealed weapons, the officers discovered a bag containing approximately four hundred Quaalude tablets in Nicotra's sock. After being advised of his Miranda rights, Nicotra told the officers that he had just purchased the contraband from Bearden.
About this time the agents, who had been left behind to maintain surveillance of the Bearden residence, radioed Lt. Soto that Bearden had left his house. Lt. Soto ordered the agents to follow the subject. Bearden drove to the home of an apparently well-known drug dealer, Edwardo Arroyo, (see testimony of Lt. Soto, transcript pages eight and nine) and, a short time after entering the house, emerged clutching a bulging jacket pocket.
Lt. Soto ordered the agents following Bearden to arrest him when he had driven a safe distance from the Arroyo house. The agents stopped Bearden's car and, upon searching his person, found a bag in his packet pocket containing 500 Quaaludes. *1113 After Bearden was arrested and advised of his rights, Lt. Soto arrived, informed the subject that a warrant for a search of his residence could be prepared, and requested that he consent to the search. Bearden acquiesced to the request, apparently concerned for his pregnant wife and child who were at home, and, additionally, implicated Edwardo Arroyo as a supplier from whom he had purchased the Quaaludes.
Upon their arrival at the Bearden house, Bearden's wife became hysterical and, according to Lt. Soto: "We had to put handcuffs on her to subdue her because she started swinging at the officers." After finding additional Quaaludes in the residence, the police discontinued the search, with the intention of obtaining a warrant for the search of the Arroyo house. During the Bearden search, it was learned that Arroyo was the godfather of one of the Bearden children. Lt. Soto, fearing that Mrs. Bearden would alert the Arroyo household, dispatched five officers to the house. After he gave the agents approximately five minutes "head start", Lt. Soto left the Bearden residence for his office on the Eastbank in order to prepare the Arroyo search warrant. Soto testified that the search of the Bearden house had taken approximately forty minutes and that he exited the residence at approximately 9:50 p.m.
At the Arroyo home, the officers entered the residence and gathered the occupants into the front room. The testimony differs as to the mode of entrance. Officer Lachute testified as follows:
Okay. We approached the house, knocked on the door, identified ourselves as police officers, you know. We advised them what was going on, that we were obtaining a search warrant for the house, if we could come inside and stand by with everybody inside, which they let us come inside. We went inside. We had everybody sit down on the couch and we watched TV until Lt. Soto arrived back with the search warrant. Ronnie Bearden, on the other hand, stated that the officers came into the house with guns drawn after the door was opened by Mrs. Arroyo.
Likewise, testimony varies as to the time of the search of the Arroyo house. The officers, although acknowledging a cursory check of the residence for other occupants (including the defendant, Arroyo) maintained that the actual search was not conducted until after the warrant arrived. Bearden asserted that the search occurred upon the entry of the officers into the residence.
It was established, however, that following their entry into the house, the five officers moved Mrs. Arroyo, her child and Ronnie Bearden into the front room. Upon Edwardo Arroyo's arrival, he, too, joined the others. Agent Lachute testified he had his gun drawn but didn't know if the other agents did. For approximately two hours (9:50 p.m.11:40 p.m.), the officers maintained control over the residence and its inhabitants until Lt. Soto returned with the signed search warrant.
Following service of the warrant, a substantial quantity of methaqualone and cocaine was seized.
ASSIGNMENT OF ERROR
The motion to suppress the evidence which was filed by the defendants should have been granted and error is assigned in the denying of the motion.
ARGUMENT
I. Detention and Search of Nicotra
While both the state and the defense argue the legality of the detention and search of Nicotra, which resulted in the seizure of narcotics from his person and a statement implicating Bearden, such legality need not be established.
The 1974 Constitutional Convention expanded the scope of protection provided by the previous Constitution as regards searches and seizures by granting standing to contest the illegality of a search or seizure to "any person adversely affected." See L.S.A. Const. Art. 1, Sect. 5.
*1114 But, in State v. Culotta, 343 So.2d 977 (La.1976), the Louisiana Supreme Court held that the deterrent purpose served by the exclusionary rule did not mandate that illegally seized evidence could not be considered in support of a finding of probable cause.
In Culotta, the court, deeming admissible items seized from a residence pursuant to a search warrant which contained statements from confederates who had been illegally detained, stated the following:
The more-narrow issue before us is: Must evidence secured pursuant to an otherwise valid search-warrant, pursuant to a judicially-authorized search, be suppressed because part (although a crucial part) of the showing of probable cause made by the affidavit includes evidence and statements taken from third persons which, if objected to at the trial of guilt or innocence, are inadmissible against the accused? [...]
We do not believe that the scope of the constitutional provision was necessarily intended to exclude from the trial evidence otherwise untainted, secured through a search warrant, because part of the showing made in the affidavit used to secure the warrant is based upon evidence illegally obtained from third persons and inadmissible, if objected to at trial, against either them or the accused. (If the sole basis of the affidavit was such illegally-secured evidence, our conclusion might well be different.) [...]
Insofar as the present evidence seized pursuant to a search executed by a judicially-authorized warrant, we therefore conclude that the defendants were not "adversely affected", within the meaning and purpose of the constitutional provision, by the prior illegal arrest and seizure of the third persons in violation of Article 1, Section 5, Louisiana Constitution.
By so holding, the court concluded that since the defendants were not "adversely affected" by the prior illegal arrest and seizure of third persons, they do not have standing to assert the illegality.
In a case factually similar to that before us, State v. Bible, 389 So.2d 42, 45-46 (La.1980) vacated on other grounds 453 U.S. 918, 101 S.Ct. 3153, 69 L.Ed.2d 1001 (1981) on remand 406 So.2d 138 (La.1981), the court observed:
The use of the possibly illegal evidence for consideration in support of probable cause is particularly logical when viewed in light of the purpose of the exclusionary rule. The rule should not preclude the use of evidence seized from a vehicle in which defendants had no reasonable expectation of privacy, when the evidence was used merely to corroborate other information to support a finding of probable cause.
Accordingly, we find that the appellants do not have the standing to contest the legality of the search of Nicotra's person and both the seized narcotics and the statement of Nicotra was properly considered in evaluating whether there was probable cause to stop the Bearden vehicle.
II. Detention and Search of Bearden.
The state argues that probable cause existed for the investigatory stop of Bearden's automobile and that the Quaaludes were properly seized during the course of a weapons frisk pursuant to C.Cr.P. art. 215.1.[1]
*1115 Both federal and state jurisprudence recognize the right of a law enforcement officer to temporarily detain a person whom he reasonably suspects had committed, is committing, or is about to commit, a crime. Reasonable suspicion for such an investigatory detention is something less than the probable cause to make an arrest and must be determined under the facts and circumstances of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Jernigan, 377 So.2d 1222 (La. 1979).
It is recognized that an informant's tip can provide police officers with reasonable suspicion to make an investigatory stop. State v. Jernigan, supra at 1225. Historically, in determining whether the tip was sufficiently credible to justify the detention, the Louisiana Supreme Court followed the analysis outlined in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and State v. Paciera, 290 So.2d 681 (La.1974) and held that facts must establish the informant's credibility and the reliability of the information supplied.
Recently, the U.S. Supreme Court abandoned the Aguilar test and adopted a "totality of circumstances" approach to the evaluation of an informant's credibility holding "a deficiency in one [area of credibility] may be compensated for, in determining the overall reliability of a tip by a strong showing as to the other, or by some other indicia of reliability". Illinois v. Gates, ___ U.S. ___, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). This approach was utilized by the First Circuit in State v. Ruffin, 434 So.2d 1246 (La.App. 1st Cir. 1983) to evaluate an informant's tip which lead to a warrantless arrest.
Considering the information available to the officers in this case, we find that there was at least reasonable suspicion to effect an investigatory stop.
From a previously reliable informant, the officers learned that Bearden had a large supply of methaqualone in his residence and would make a sale at approximately 7:00 p.m. on a given date. The informant stated he had seen the drugs in the residence. Independent corroboration by the officers through observation and the stopping of Nicotra verified that the informant was correct about the time and fact of the sale and the quantity of drugs in the house. The visit of Bearden to the home of a large supplier and his exit with a package corroborated his involvement in drug trafficking.
During such an investigatory stop, a police officer is entitled to make a protective search of a suspect, which is narrowly limited in scope, for his own safety and the safety of others. Since the justification for such a search is the safety of the investigating officer and others nearby, the search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). See also State v. Landry, 393 So.2d 713 (La.1981).
Assuming that the bag of pills would not give the tactile impression of a weapon to an officer performing a body frisk, then he would not have the right to search the bag under the Terry doctrine.
However, in LaFave, Search and Seizure, A Treatise on the Fourth Amendment, 1984 pocket part, Sect. 9.4, p. 66, it was noted:
Assuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a Terry analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances will amount to probable cause that the object is contraband or some other item subject to seizure, in which case there may be a further *1116 search based upon that probable cause.
We find that in the present case even if, arguendo, the officers stopping Bearden did not have probable suspicion sufficient to make a full custodial arrest, they did have reasonable cause to detain Bearden and frisk him for weapons. During that pat-down, they felt an object, which was obviously not a weapon, but which could be tactilely identified as a large quantity of pills. Based upon information already in their possession from their informant, their own surveillance and their previous arrest of Nicotra, we find that any reasonable officer would have probable cause to believe that the object felt was contraband. At this point, the officers had probable cause to open and search the bag and, upon determining it was contraband (Quaaludes), to make an arrest. Hence, the seizure was incidental to a lawful arrest.
Another line of reasoning which validates the search of Bearden as a search made incident to a lawful arrest can be found in the words of the Louisiana Supreme Court in State v. Melton, 412 So.2d 1065 (La.1982) at 1068, wherein the court observed:
The question is not whether the formal act of arrest took place after the search was made, but whether probable cause for arrest existed before the search. If an arrest is justified before the search, it is not unreasonable for the search to be made before instead of after the arrest. See People v. Simon, 45 Cal.2d 645, 290 P.2d 531 (1955). The arrest, search and seizure must be "contemporaneous". New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). When there is probable cause but no formal arrest, a limited search to preserve evidence is justified. Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). A limited search such as this is lawful if there is probable cause for arrest, regardless of whether the arrest comes before or after the search. [footnote omitted].
See also State v. Guidry, 442 So.2d 1251, (La.App. 5th Cir.1983).
A police officer may arrest a person without a warrant when the peace officer has "reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; ...." C.Cr.P. art. 213(3).
The Louisiana Supreme Court in State v. Leatherwood, 411 So.2d 29, 32 (La.1982) stated: "Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. [citations omitted]."
[A]lthough the measure of probable cause does not require the arresting officer to have sufficient proof to convict the accused, the arrest may not be predicated upon mere suspicion. State v. Scott, 355 So.2d 231 (La.1977), rehearing denied 1978. Probable cause is to be judged by the probabilities and practical considerations of everyday life on which average men, particularly average police officers, can be expected to act. State v. Smith, 377 So.2d 1220 (La.1979).
State v. Webb, 432 So.2d 362 (La.App. 1st Cir.1983), at 364.
Evaluating the evidence known to the arresting officer, as disclosed by the testimony, we conclude that probable cause to make an arrest did exist when Bearden was stopped because of the following:
1. The confidential informant was one used on numerous occasions over the course of several years and whose credibility had been established.
2. The C.I. saw a quantity of drugs in the residence and gave notice to the narcotics officers of a transaction to occur at the residence and an approximate time.
3. The officers viewed activity at the residence consistent with the informant's tip.
4. The seizure of narcotics from Nicotra's person and his subsequent statement *1117 corroborated that a narcotics transaction had occurred.
5. The above knowledge, the visit to the Arroyo home by Bearden, and his exit from the residence with a bulging jacket pocket, substantiated the belief that Bearden was engaged in drug trafficking.
See also State v. Ruffin, 434 So.2d 1246 (La.App. 1st Cir.1983).
Since probable cause to arrest Bearden existed before he was "detained", the contemporaneous search of his person does not offend constitutional principles. We hold that the arrest of Bearden actually occurred not after the search and seizure of the Quaaludes from his pocket but at the time the officers approached his vehicle and ordered his exit. From Bearden's own testimony, it is apparent that he considered himself not free to leave from that point.
III. Search of the Bearden Residence.
The defense argument concerning the search of the Bearden residence is two fold.
1. That the consent to search was not sufficiently attenuated from the illegal detention of Bearden so as to escape the "fruit of the poisonous tree" doctrine. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and Wong Sun v. United States 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 471 (1971).
2. The consent to search was not freely and voluntarily given.
Fruit of the poisonous tree doctrine
Numerous cases establish that consent given subsequent to an illegal arrest which constitutes an exploitation of that illegality is invalid and any evidence seized pursuant to such consent must be ordered suppressed. See Wong Sun v. United States, supra; State v. Wolfe, 398 So.2d 1117 (La. 1981); State v. Zielman, 384 So.2d 359 (La.1980); and State v. Mitchell, 360 So.2d 189 (La.1978).
However, having previously decided that the arrest of Bearden was lawful, we find this argument without merit.
ConsentVoluntariness Issue
A valid consent search is a well-recognized exception to the warrant requirement, but the burden is upon the state to prove that the consent was given freely and voluntarily. Voluntariness is a question of fact to be determined by the trial judge upon consideration of the facts and circumstances of each case. See State v. Edwards, 434 So.2d 395 (La.1983) and State v. Ludwig, 423 So.2d 1073 (La.1982). These factual determinations are to be given great weight upon appellate review. See State v. Edwards, supra; State v. Smith, 433 So.2d 688 (La.1983); and State v. Robinson, 386 So.2d 1374 (La.1980).
Whether the defendant was under arrest at the time of the consent is a factor to be considered in determining whether the defendant voluntarily consented to the search, although the fact of custody does not, of itself, render the consent involuntary. See State v. Bourgeois, 388 So.2d 359 (La.1980).
Whether the person was advised of his right to refuse consent or was coerced into acquiescing is likewise to be considered. State v. Bourgeois, supra.
The testimony of Ronnie Bearden reflected confusion as to the sequence of events following his arrest. Although he acknowledged his signature on the consent form, the defendant stated he only signed because the officers agreed not to arrest his wife, who was then seven months pregnant. He stated he did not remember whether he was advised of his rights, but he also said the consent form was explained to him by the officers before he signed it.
Lt. Soto, who witnessed the signing of the consent form, testified that the defendant Bearden was given the opportunity to review the consent form and was informed that he did not have to sign it. Lt. Soto testified as follows:
.... Shortly thereafter, I arrived on the scene, and I advised Mr. Bearden that we were going to get a search warrant for his residence. I asked him if he would *1118 consider giving us a consent search, and he advised us that he had a pregnant wife and that he didn't want any kind of problems or anything and he'd be more than happy to give us a consent search. So
Officer/Agent Lachute who actually made the arrest depicted the defendant Bearden as "cooperative". He stated that following the advice of rights, Bearden conversed with the officers making the arrest.
As in Bourgeois, supra, we find that the defendant could have easily concluded from all the circumstances that it was in his best interest to cooperate.
"In any event, where there is contradictory testimony at trial, the trial judge's evaluations of credibility are entitled to great weight. State v. Martin, 376 So.2d 300 (La.1979); State v. Dunbar, supra [356 So.2d 956 (La.1978)]; State v. Tennant, 352 So.2d 629 (La.1977)." State v. MacDonald, 390 So.2d 1276, 1279 (La.1980). The trial judge obviously believed the testimony of the officers over that of Bearden and we have no basis or right to disturb his credibility call in this instance. Accordingly, this argument also lacks merit.
IV. Search of the Arroyo home:
Initially, Arroyo contends that the warrant application was insufficient to support a finding of probable cause since a portion of the information was obtained as a result of the illegal detention of Nicotra and Bearden. In support of his argument that such "illegally" obtained evidence must be deleted from the warrant, the defense cites Wong Sun v. United States, supra.
However, as noted previously, the information acquired by the officers from Nicotra and Bearden can be used to support a finding of probable cause, even if illegally obtained. We have already found that the arrest of Bearden was nevertheless legitimate.
Considering the entirety of the warrant application in light of the more relaxed standard enunciated by the Supreme Court in Illinois v. Gates,[2] supra, we find the warrant application contains sufficient information to justify the conclusion of the magistrate that contraband would be located in the Arroyo residence. Thus the search warrant was properly and validly issued.
The defense next argues that the seizure of the Arroyo residence to await the warrant was a violation of his Fourth Amendment rights. The apparent thrust of this argument is that such a seizure taints the subsequent search pursuant to an otherwise valid warrant.
On this issue, we rely exclusively on federal jurisprudence as it does not appear that any Louisiana courts have addressed the argument presented for our review.
As observed in United States v. Thompson, 700 F.2d 944, 946 (5th Cir. 1983):
[S]earches conducted without a warrant "are per se unreasonable under the fourth amendmentsubject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted) (emphasis in original). These exceptions are "jealously and carefully drawn, and there must be a `showing by those who seek exemption ... that the *1119 exigencies of the situation made [the search] imperative.'" Coolidge v. New Hampshire 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (quoting Jones v. United States 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), and McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)). The burden is on the government to show that the search falls within one of the exceptional situations. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct., 1969, 1971, 26 L.Ed.2d 409 (1969).
Since the prohibitions of the Fourth Amendment apply fully to "securing" or "seizing" a residence, as well as searching it, we must determine whether the seizure of Arroyo's house was authorized under an exception to the warrant requirement. See United States v. Kunkler 679 F.2d 187 (9th Cir.1982) and United States v. Allard, 634 F.2d 1182 (9th Cir. 1980) (Allard II).
One exception to the warrant requirement is that invoked by "exigent circumstances". McDonald v. United States, 335 U.S. 451 at 455, 69 S.Ct. 191 at 193 (1948).
As noted by the U.S. Third Circuit in United States v. Rubin, 474 F.2d 262, 268-269 (3rd Cir.1973):
When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, [citations omitted]; (2) reasonable belief that the contraband is about to be removed, [citations omitted]; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, [citation omitted]; (4) information indicating the possessors of the contraband are aware that the police are on their trial, [citation omitted]; and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic."
See also United States v. Thompson, 700 F.2d 944, 948 (5th Cir.).
Our analysis of the circumstances presented in this case convinces us that the officers were presented with a situation not of their own making, and certainly some, if not all, of the exigent circumstances set forth in Rubin, supra, were present here. They had reasonable grounds to believe that if they had not taken swift action the contraband could have been moved and/or destroyed, and the supplier could have eluded prosecution. See United States v. Thompson, supra at 950. The officers were prudent and had reasonable cause to act as they did in view of the knowledge they already possessed and the circumstances presented to them. Therefore, we find that the seizure of the Arroyo residence (and even its search, if such had been the case) without a warrant was justified and legally valid.
Additionally, we point out again that in criminal cases the determination of credibility is relegated to the trier of fact, State v. Robertson, 421 So.2d 843 (La. 1982), whereas the function of this court is limited to the review of questions of law. La. Const. Article 5, Sec. 10(B) (1974).
Accordingly, for the reasons assigned, we find that the ruling of the trial court on the motion to suppress was correct. Consequently, the defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] C.Cr.P. art. 215.1 provided at the time of the offense:

A. A law enforcement officer may stop a person in a public place whom he reasonably believes is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably believes that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably believes the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
[2] Justice Renquist, delivering the opinion of the court:

[W]e conclude that it is wiser to abandon the "two-pronged test" established by our decisions in Aguilar and Spinelli. [footnote omitted]. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations. [citations omitted]. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances before set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. [citations omitted]
(Supra, ___ U.S. at ___, 103 S.Ct. at 2332).