liKLIEBERT, Judge.
The Jefferson Parish Grand Jury returned an indictment on February 10,1994 charging the defendant was in possession of heroin with intent to distribute, a violation of LSA-R.S. 40:966. When arraigned on the charge on March 25, 1994, the defendant entered a plea of not guilty. On July 15,1994, the trial court heard motions to suppress confession and evidence. At the conclusion of the hearing, the trial court denied the motion to suppress confession but reserved its ruling on the motion to suppress evidence. Subsequently, the trial court denied the motion to suppress evidence on July 25, 1994. From the denial of the motion to suppress evidence, the defendant filed a writ application with this Court on August 10, 1994, and this *491 Court denied the writ on September 19, 1994.[1] On October 17, 1994, the trial court granted a rehearing on the motion to suppress evidence, and at the conclusion of the hearing that date, the court denied the motion. The defendant proceeded to trial on October 18,1994, and at the conclusion of the three-day trial, the jury returned with a verdict of guilty as charged. On January 27, 1994, the trial court denied the defendant’s motion for new trial, and on February 2, 1995, the |2trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation or suspension of sentence.
On appeal, defendant argues three assignments of error:
1) The trial court erred in denying the motion to suppress the evidence and the confession, when it was shown that the search and ensuing statement were the direct products of the illegal stop, search, and questioning of Terry Russell;
2) The conviction should be reversed because it was the product of deliberate deception by the district attorney as to the amount of heroin found in the defendant’s house, and its value;
3) Insufficient evidence exists to justify a verdict of guilty of possession with the intent to distribute, rather than a verdict of simple possession.
After thorough review, we affirm defendant’s conviction.
On January 4, 1994, Agents Orgeron and Ladd received information that the defendant was selling heroin from his residence located at 680 Central Avenue, Apt. Q, in Jefferson, Louisiana. Based on that information, Agents Orgeron and Ladd established surveillance of the defendant’s apartment complex later that evening, and within twenty minutes, the agents observed a white male drive up to the complex. After exiting his vehicle, the subject, later identified as Terry Russell, looked up and down the street in a manner the agents believed to be nervous and fearful of being observed. Because of this behavior, they became suspicious that his behavior indicated involvement in drug trafficking.
When Russell started walking towards the apartment complex, Agent Ladd followed him while Agent Orgeron remained in the vehicle from which the agents were conducting the surveillance. After following Russell about halfway through the complex, Agent Ladd observed him stop and look back over his shoulder. According to Agent Ladd, Russell was determining whether he was being followed; however, Russell failed to detect Agent Ladd, so he continued walking through the complex. After observing Russell enter the defendant’s apartment, Agent Ladd notified Agent Orgeron of that fact. Agent Ladd also notified Sergeant Gibbs who had recently laarrivéd on the scene. Sergeant Gibbs set up a surveillance of the defendant’s apartment. Agent Ladd then returned to his vehicle.
After moving the vehicle closer to Russell’s vehicle, Agents Orgeron and Ladd positioned themselves so that they could observe the defendant’s apartment. When the door to the defendant’s apartment opened within four to six minutes after Russell entered it, only Sergeant Gibbs was able to observe Russell speaking with the defendant in the doorway. As Russell proceeded to walk to his vehicle, Agent Orgeron noticed that he was looking in all directions and back at the defendant’s apartment, while Agent Ladd detected that Russell was walking “a lot faster coming out than he did going in.” Additionally, both agents again noted that Russell appeared nervous. When Russell reached the front of the apartment complex, Agents Orgeron and Ladd decided to stop him.
Agent Ladd walked up to Russell with his photograph identification in his hand while Agent Orgeron approached bim from behind. Agent Orgeron then grabbed Russell by the neck, placing him in a “chokehold.” In explaining his actions, Agent Orgeron testified at trial as follows:
Well, its a normal consistency in my past experience in narcotics investigations that known traffickers and users, once they *492 score [obtain drugs], they usually carry, especially, in particular, in heroin, they carry the contraband in — the heroin in their mouth, or they carry it in their hand, and I was concerned about if he had it in his mouth, swallowing the evidence, and I would lose the evidence.
While grasping Russell’s neck, Agent Or-geron displayed his photograph identification and identified himself and Agent Ladd as police officers. Agent Orgeron then noticed that Russell was “clenching his hand at his side.” After determining that Russell did not have anything in his mouth, Agent Or-geron removed his hand from Russell’s neck and asked him what he had in his hand; however, Russell refused to answer. When Agent Orgeron asked Russell the same question again, Russell opened his hand revealing two foil wrappers and Agent Orgeron “retrieved” the wrappers from Russell. After performing a preliminary field test on the wrappers which confirmed that they contained heroin, Agent Orgeron arrested Russell. A search of Russell’s person revealed nothing. Agent UOrgeron then advised Russell of his Miranda rights and began questioning him.
At the hearing on the motion to suppress evidence, Agent Orgeron testified that Russell revealed the following in response to questioning. He stated that he had purchased the two wrappers of heroin from the defendant for $50.00 and that two individuals had come to his nearby residence and had asked him to purchase the heroin for them. Additionally, he stated that he telephoned the defendant about the purchase and the defendant told him to come over to pick up the heroin.
Fearing that the defendant might receive a warning and destroy the evidence, Agents Orgeron and Ladd contacted Sergeant Gibbs and other agents for back-up assistance in order to secure the defendant’s apartment. After forcing the door open, the agents entered the defendant’s apartment with then-guns drawn. The agents found the defendant in the kitchen holding $240.00 in cash which he tossed into the air upon seeing the agents. The agents observed in plain view on the counter in the kitchen a clear plastic bag containing ten foil wrappers. In the living room, the agents discovered the defendant’s “common-law wife,” Rebecca Witcher, and infant daughter. During a check on the apartment for other suspects, the agents found another clear plastic bag containing thirteen foil wrappers in plain view on the top of a dresser in the bedroom. Agents Orgeron and Ladd then returned to then-office to prepare an affidavit for a search warrant while the other agents remained in the apartment.
In the affidavit, Agent Orgeron additionally indicated that the information regarding the defendant’s selling of heroin was obtained from a “confidential informant, who through independent investigation proved to be rehable and credible.” After obtaining the search warrant at approximately 11:11 P.M., Agents Orgeron and Ladd returned to the defendant’s apartment. The agents then seized the two clear plastic bags in the kitchen and in the bedroom which were found in plain view. They also seized a clear plastic bag containing a white powder substance which was found in the top |5dresser drawer in the bedroom, $240.00 in cash in the kitchen, $140.00 in cash which was found inside a sock in the top dresser drawer in the bedroom, and two syringes. Following the seizure of the evidence, the defendant was arrested.
Before being transported from the scene, the defendant gave a written statement after being advised of his Miranda rights and executing a waiver of rights form. In his statement, the following exchange occurred:
Q. Have you been advised of your rights as per Miranda and do you understand them?
A. Yes.
Q. On 1-4-94 a search warrant was executed on your apartment. During the search, approximately 1 bundle of heroin was discovered. Does the heroin belong to you?
A. Yes.
Q. Your wife Rebecca Witcher was also in the apt. Does she have any knowledge of the heroin?
A. No. She knows nothin[g] about it.
*493 Q. Do you wish to tell us how or from whom you obtained the heroin?
A. Wait and see if we can work something out.
Q. Is there anything you wish to add or delate [sic] from this statement?
A. Yes, I want it to be known the heroin was found on the counter before the warrant was signed.
Subsequently, Sergeant Gibbs placed the $380.00 in cash in a sock and hid it in the bedroom. When Sergeant Merida arrived on the scene with a narcotics detecting dog, it alerted to the area where the sock was hidden. Sergeant Gibbs then seized the cash.
At trial, Milton Dureau, an expert in the field of forensic chemistry and identification and analysis of controlled dangerous substances, testified that the ten foil wrappers found in the kitchen, the thirteen found in the bedroom, the two found on Russell’s person and the bag containing the “unpackaged” white powder contained heroin. He stated that the ten wrappers weighed 0.6 grams while the thirteen wrappers weighed 0.4 grams. He also stated that the bag containing the “unpackaged” heroin weighed two grams. He further testified that the average concentrations of ^heroin in the ten wrappers, the thirteen wrappers, and the unpack-aged heroin were 19½%, 18.8% and 17.7%, respectively.
On appeal, defendant contends the trial court erred in denying the motion to suppress the evidence and the confession, when it was shown that the search and ensuing statement were the direct products of the illegal stop, search, and questioning of Terry Russell. In support of his contention, the defendant argues that had Russell not been arrested, searched, and questioned without probable cause, the agents would not have had sufficient information to justify the issuance of a search warrant. The defendant further asserts that he has standing to contest the stop of Russell considering that, under Article 1, Section 5, of the Louisiana Constitution of 1974, a defendant has the standing to complain of an illegal search affecting him.
Article 1, Section 5, of the Louisiana Constitution provides:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court, (emphasis added).
This provision expands the scope of protection afforded Louisiana citizens by granting standing to contest the illegality of a search or seizure to “any person adversely affected.”
In State v. Culotta, 343 So.2d 977 (La.1976), the Louisiana Supreme Court concluded that the defendants were not “adversely affected” within the meaning and purpose of the constitutional provision by the use of evidence illegally obtained from third persons in support of a finding of probable cause for the issuance of a search warrant; thus, the defendants did not have standing to assert the illegality. The Court in Culotta further held that the evidence seized pursuant to a search executed by a judicially-authorized warrant did not have to be suppressed although a crucial part of the showing of probable cause contained in the affidavit included evidence and statements which were the product of an |7illegal arrest and search of third persons. In so holding, the Court stated the following:
The more-narrow issue before us is: Must evidence secured pursuant to an otherwise valid search-warrant, pursuant to a judicially-authorized search, be suppressed because part (although a crucial part) of the showing of probable cause made by the affidavit includes evidence and statements taken from third persons which, if objected to at the trial of guilt or . innocence, are inadmissible against the accused?
[[Image here]]
*494 We do not believe that the scope of the constitutional provision was necessarily intended to exclude from the trial evidence otherwise untainted, secured through a search warrant, because part of the showing made in the affidavit used to secure the warrant is based upon evidence illegally obtained from third persons and inadmissible, if objected to at trial, against either them or the accused. (If the sole basis of the affidavit was such illegally-secured evidence, our conclusion might well be different.)
State v. Culotta, 343 So.2d at 982.
In State v. Bearden, 449 So.2d 1109 (La.App. 5th Cir.1984), writ denied, 452 So.2d 179 (1984), this Court, following Culotta, held that the defendants did not have standing to contest the legality of the detention and search of a third person which resulted in the seizure of narcotics from his person and a statement implicating the defendant Bearden as the seller; both the narcotics and statement were properly considered in evaluating whether there was probable cause to stop Bearden’s vehicle.
Considering the above jurisprudence, the defendant in the instant case does not have the standing to contest the legality of the stop of Russell; thus the evidence and statements obtained as a result of the alleged illegal detention of Russell were properly considered in finding that there was probable cause for the issuance of the search warrant and the evidence seized pursuant to the search warrant and the subsequent confession were admissible at trial. As such, the trial court did not err in denying the motion to suppress the evidence and confession.
Next, defendant argues that his conviction should be reversed because it was the product of deliberate deception by the district attorney as to the amount of heroin found in the defendant’s house, and its value.
IgThe defendant contends that the prosecutor, in closing arguments, mischaracterized the testimony of Detective Austin, an expert in the field of narcotics trafficking, packaging and street level drug dealing, by stating that the two grams of unpackaged heroin could yield a maximum of six bundles and that the heroin in the defendant’s apartment, including the unpackaged heroin, was worth $6,000.00.
However, the defense counsel did not make a contemporaneous objection to the prosecutor’s remarks and therefore the defendant is precluded from raising this issue on appeal. LSA-C.Cr.P. art. 841.
Last, defendant claims insufficient evidence exists to justify a verdict of guilty of possession with the intent to distribute, rather than a verdict of simple possession. The defendant contends that the evidence was insufficient to establish the element of intent to distribute and therefore his conviction should be reduced to simple possession of heroin.
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986); State v. McCaleb, 593 So.2d 1388 (La.App. 5th Cir.1992), writ denied, State ex rel. McCaleb v. State, 626 So.2d 1185 (La.1993).
Narcotics offenses involving possession with intent to distribute require proof of specific intent. State v. Elzie, 343 So.2d 712 (La.1977); State v. McCaleb, supra. LSA-R.S. 14:10(1) defines specific criminal intent as that “state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” The intent to distribute may be established by proving circumstances surrounding a defendant’s possession which |3give rise to reasonable inference of intent to distribute. State v. Ramoin, 410 So.2d 1010 (La.1981).
Several factors which are useful in determining whether circumstantial evidence is sufficient to prove the intent to distribute include (1) whether the defendant ever distributed or attempted to distribute the drug; (2) whether the drug was in a form usually associated with possession for distribution to *495 others; (3) whether the amount of drug created an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant’s possession is inconsistent with personal use only; and (5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute. State v. Hearold, 603 So.2d 731 (La.1992). In the absence of circumstances from which an intent to distribute may be inferred, mere possession of a drug does not amount to evidence of intent to distribute, unless the quantity is so large that no other inference is possible. State v. Hearold, supra.
The evidence adduced at trial established that the defendant was in possession of 23 foil wrappers of heroin and two grams of unpackaged heroin.
In order to raise an inference of intent to distribute from the amount of the heroin possessed by the defendant, the State presented the testimony of Detective Austin who testified at trial as follows: A bundle of heroin consists of 25 dosages. “A bundle is probably the most prevalent wholesale amount that’s sold” and “the one who possesses a bundle of heroin is normally the person who’s going to retail it out in individual dosage units.” A dosage unit or a “hit” of heroin is commonly packaged in aluminum foil and weighs between 35 to 50 milligrams with a concentration of heroin between 7% and 13%. The price of a hit ranges between $35.00 to $50.00 “depending on who’s buying and who’s selling” and the wholesale price for one bundle averages between $300.00 and $400.00. One gram of 100% pure heroin basically could yield 50 50-milligrams hits, but depending “on how far down they cut it,” one gram could yield at least 3 bundles. When asked how many bundles | iptwo grams of unpackaged heroin would yield based on his previous testimony, Detective Austin stated 4 to 6 bundles. He further testified that the fact that someone may use heroin does not preclude him from selling it.
Detective Austin also admitted that a heroin addict could consume anywhere from one hit to possibly more than 50 depending on his degree of addiction; however, a 50-hit-a-day addiction at $35.00 to $50.00 a hit would cost around $2,000.00 to $2,500.00. He further stated that it is possible for someone who deals narcotics to leave a “narcotic residue” on the money he contacts.
In the instant case the two grams of un-paekaged heroin was already “cut,” considering that its heroin concentration was 17.7% and that level was lower than the levels found in the ten and thirteen aluminum foil wrappers. Using Detective Austin’s testimony that a hit weighs between 35 to 50 milligrams, the two grams of unpackaged heroin would yield 40 to 57 hits.
The defendant argues that the State’s case was based solely on the amount of heroin found in the defendant’s apartment, and considering the testimony by defense witnesses that the defendant was a heroin addict, the evidence did not exclude the possibility that the amount of heroin possessed by the defendant was for his personal use.
However, in addition to proving that the defendant was in possession of 23 foil wrappers of heroin and two grams of unpackaged heroin which could yield between 40 to 57 hits, the evidence established that the defendant was in possession of $380.00 in cash and a narcotics-deteeting dog alerted officers to the money, thereby raising the inference that the money was proceeds from the distribution of heroin. The evidence also established that the 23 foil wrappers of heroin were in a form consistent with packaging for distribution to others. Additionally, Russell was stopped leaving defendant’s apartment, and admitted buying heroin from defendant, which was packaged in foil wrappers as was heroin found in defendant’s apartment. Viewing this evidence in the light most favorable to the | nprosecution, there was sufficient evidence to establish that the defendant possessed the heroin with intent to distribute.[2]
*496 Defendant has also requested that this Court review the record for errors patent as per LSA-C.Cr.P. art. 920. For the purpose of an error patent review, the “record” in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment of sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
The sentencing transcript, unlike the minute entry/commitment, fails to reflect that the defendant was given credit toward service of his sentence; however, such an allowance is mandatory. LSA-C.Cr.P. art. 880; State v. Sherman, 532 So.2d 908 (La.App. 5th Cir.1988). Therefore, we amend the defendant’s sentence to confirm the minute entry/commitment and give the defendant credit toward service of his sentence for time spent in actual custody prior to imposition of sentence in compliance with the mandatory terms of LSA-C.Cr.P. art. 880.
Also, the transcript of defendant’s sentencing on February 2, 1995 reflects that the defendant was not informed of the time limits in which to file for post conviction relief as per LSA-C.Cr.P. art. 930.8. Failure to inform the defendant does not constitute a ground for reversing the sentence or remanding the case for resentencing. LSA-C.Cr.P. art. 921. We remand the case however with instructions for the trial court to inform the | ^defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Kershaw, 94-141 (La.App. 5th Cir. 9/14/94) 643 So.2d 1289.
CONVICTION AFFIRMED; SENTENCE AMENDED AND, AS AMENDED, AFFIRMED; REMANDED WITH INSTRUCTIONS.

. State v. Mills, 94-K-671 (La.App. 5th Cir. 9/19/94), writ denied, 94-KK-2515 (La.12/9/94), 647 So.2d 1115.

. There was also evidence presented at trial regarding Russell’s possession of two wrappers of heroin. Even assuming Russell was illegally detained and evidence of his possession of heroin was inadmissible at trial, the defendant's conviction was unattributable to the admission of such evidence and its admission was harmless error. See Sullivan v. Louisiana, - U.S. -, 113 *496 S.Ct. 2078, 124 L.Ed.2d 182 (1993), on remand, 623 So.2d 1315 (La.1993); State v. Code, 627 So.2d 1373 (La.1993), cert. denied, -U.S.-, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994), rehearing denied, - U.S. -, 114 S.Ct. 2775, 129 L.Ed.2d 887 (1994).