518 So.2d 554 (1987)
STATE of Louisiana
v.
Stephen GERACI.
Nos. 87-KA-339, 87-KA-341.
Court of Appeal of Louisiana, Fifth Circuit.
December 8, 1987.
*555 Frank J. Larré, Kenner, Dale Cannizzaro, New Orleans, for defendant-appellant.
Art Lentini, Asst. Dist. Atty., Dorothy Pendergast, Asst. Dist. Atty., Research & Appeals, Office of the Dist. Atty., Gretna, for the State.
Before BOWES, WICKER and GOTHARD, JJ.
BOWES, Judge.
Defendant, Stephen Geraci, on two bills of information, was charged with narcotics violations. One bill charged the defendant with a violation of LSA-R.S. 40:966, in that he did knowingly and intentionally possess a controlled dangerous substance, to wit: heroin (case number 86-2268; appeal number 87-KA-341). The second bill charged the defendant with a violation of LSA-R.S. 40:967, in that he did knowingly and intentionally possess a controlled dangerous substance, to wit: oxycodone (case number 86-2416; appeal number 87-KA-339).
The defendant filed a motion to suppress evidence in each case, both of which were denied. The accused then pled guilty as charged, but reserved his right to appeal the adverse ruling on the suppression motions under State v. Crosby, 338 So.2d 584 (La.1976). The trial court sentenced defendant in case number 86-2268 (possession of heroin) to four years at hard labor without benefit of parole, probation or suspension of sentence. In case number 86-2416 (possession of oxycodone), the court sentenced the defendant to imprisonment at hard labor for one year, to run concurrently with the four-year sentence imposed in case number 86-2268. Defendant appeals, challenging the trial court's denial of his motion to suppress. This Court ordered that the two cases be consolidated on appeal.
FactsCase Number 87-KA-339 (86-2268)  R.S. 40-966Possession of Heroin
At the hearing on the motion to suppress held October 27, 1986, Detective Wethern of the New Orleans Police Department testified as to the information he received from the confidential informant regarding the defendant's involvement with bringing heroin into the New Orleans Airport from the Fort Worth, Texas area:
A. I had received information from a confidential source of established reliability that Miss Dick and Stephen Geraci were engaged in the wholesale and retail distribution of both Black Tar Heroin and Dilaudid.
According to this source, through his personal observation and experience with the individuals, Mr. Geraci had, the week prior to the arrest, completed a trip to the Fort Worth, Texas area to purchase a *556 wholesale quantity of Black Tar Heroin. The informant added that Mr. Geraci would be making another trip to Fort Worth for the express purpose of picking up another quantity of heroin on Friday, AugustI don't recall the exact date; I think it was the 9th. The first trip was on the 3rd, and the second trip was somewhere around the 9th. And that the informant would contact me as the situation developed.
Okay. On that Friday, I received a call from the informant who advised me that Mr. Geraci was enroute to the airport and was either preparing to board the plane or had already left the city enroute to Fort Worth, Texas.
In response to that information, I contacted several airlines, including Delta Airlines, trying to verify that information. Via telephone, a representative from Delta Airlines advised me that Mr. Geraci had reserved a seat on a flight to Fort Worth, Texas but when the tickets were picked up, the reservation was changed from Stephen Geraci to Brandon Schultz; and that the individual had picked up the tickets.
I then proceeded to New Orleans International Airport with a photograph of Mr. Geraci and spoke with the representatives of Delta Airlines. They identified the photograph of Mr. Geraci as the individual who had represented himself as Brandon Schultz and as the individual who had boarded the airplane enroute to Fort Worth.
We, checking in there, through Delta's records, we found out that an individual using that name of Brandon Schultz had booked a return flight to return that night, and we made preparations at that time to conduct a surveillance of the airport to await Mr. Geraci's return.
(R., pp. 161-163)
Pursuant to the above information, the officers undertook a computer check on the defendant which indicated that he was a narcotics trafficker with several prior narcotics arrests and there was an outstanding warrant on Mr. Geraci for theft. Thereafter, several officers set up surveillance on Friday, August 8, 1986, expecting Geraci to return that night. When Geraci failed to arrive at the airport Friday night, the officers continued the surveillance Saturday morning to await his anticipated return. As expected, the defendant did arrive at the New Orleans International Airport Saturday morning on a flight which originated in Dallas, Texas.
Officer Mottley, one of the officers conducting the surveillance, testified that when the defendant disembarked from the plane, he was carrying a small carry-on bag, and was subsequently met by a white female, identified as Leslie Dick. The officer continued a moving surveillance on the two from the arrival gate down to the departure and baggage claim area. The defendant did not pick up any additional bags at the baggage claim area.
As Stephen Geraci and Leslie Dick started to leave the airport, they were stopped by the officers (the record indicates that approximately six plain clothes officers were present at the time), who identified themselves as such and who requested that the two accompany them to the Kenner Police Office in the airport. Stephen Geraci and Leslie Dick were then brought to the police room, where they were orally advised of their rights and were told that the police were conducting an investigation of possible narcotics traffic. After this initial advice of rights, the police asked Stephen Geraci if he would consent to a search of his bag, telling him that he had the right not to consent to the search, but that he could be temporarily detained in order for a search warrant to be obtained. After this was explained to him, he signed the form consenting to the search of his luggage. Officer Mottley testified that at the time defendant's consent was requested, he was not handcuffed, nor did anyone threaten, coerce, or abuse him in any way. In addition, no weapons were drawn.
Following the execution of the consent form, the defendant's luggage was searched and the police found and seized two small clear plastic bags containing a brown oily substance that were inside a Milk Duds box. A preliminary chemical *557 field test proved the substance to be heroin. This result was corroborated by a subsequent laboratory analysis. After the search, the defendant was again advised of his rights both orally and in a written form, which was signed by the defendant.
The defendant, Stephen Geraci, also testified at the suppression hearing; however, his version of the facts was somewhat different than that of the officers. The defendant testified that about five or six officers approached him and his female companion from behind, separated the two, put them up against the wall, and took his bag. The defendant testified that he was not free to leave because the officers arrested him at the door when they first stopped him. At this point, the defendant was not told what he was charged with, nor was he given his rights.
After stopping the defendant, the officers brought him to a police room and told him that he was under investigation for narcotics violations, and further told him that he could either sign the consent form or be held there until a search warrant was obtained. Feeling there was no choice in the matter, the defendant signed the form without reading it. According to defendant, his bag was then searched and found to contain two grams of heroin. After the police found the heroin, they locked the defendant "in a little cage" and strip-searched him. Defendant further testified that he was originally arrested for possession of heroin, and the first time he heard about the theft charges was when he was brought to the jail.
When the officers stopped him, two or three of them told him he was under arrest right there, and, although they did not handcuff him, the officers physically held him, one on each side and two behind, while walking to the airport detention room. Once in the detention room, the defendant was told that he was under investigation for possible narcotics violations. The defendant acknowledged that an advice of rights form was executed after he signed the consent form.
The learned trial judge obviously believed the factual version of the officers as he denied the motion to suppress.
Defendant presents only one assignment of error in this case, namely:
The trial court erred in denying the motion to suppress the evidence.
Assignment of Error No. 1Case Number 86-2268
In his brief, defendant argues that there was no probable cause for his arrest and, therefore, his subsequent consent to search was not validly obtained, and the evidence seized as a result of the search should not have been suppressed.
Both State and Federal constitutions prohibit unreasonable searches and seizures. U.S. Const. Amendment IV, XIV; La. Const. Art. I, Sec. 5. Implicit in this protection is a restraint upon police from approaching an individual under circumstances which make it seem that some form of detention is eminent unless the police have either probable cause to arrest or reasonable grounds to detain. State v. Ruffin, 448 So.2d 1274 (La.1984); see also LSA-C.Cr.P. Art. 213 and 215.1.
Courts have consistently recognized the right of a police officer to make an investigatory stop of an individual if he reasonably suspects that the individual is involved in criminal activity. The U.S. Supreme Court, in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed. 612 (1972) and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), approved investigatory stops of individuals based on reasonable suspicion. See also State v. Ossey, 446 So.2d 280 (La.1984), Cert. den. Ossey v. Louisiana, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984); State v. Brown, 370 So.2d 547 (La.1979); State v. Thomas, 482 So.2d 32 (La.App. 5 Cir.1986).
We find that the initial stop of the defendant by the officers was within the parameters of the type of investigatory stop covered under the rules of Terry, supra. However, when the defendant was relocated from the public area of the airport, surrounded by six officers and taken *558 to the detention room, and one officer testified that the defendant was not free to leave, the action exceeded the limits of the type of stop contemplated by Terry, and was suggestive of an arrest, even though the officers testified that the defendant was not placed under arrest until after his consensual search. Under State v. Commodore, 418 So.2d 1330 (La.1982): "An arrest occurs when [the] circumstances indicate an intent to effect an extended restraint on the liberty of an accused, rather than at the precise time an officer tells the accused he is under arrest." See also State v. Ruffin, supra; State v. Wichers, 392 So.2d 419 (La.1980).
It is well established that probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Additionally well established is that probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Raheem, 464 So.2d 293 (La.1985); State v. Edwards, 406 So.2d 1331, cert den. Edwards v. Louisiana, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1981).
In the case before us, the police initially relied on information supplied by a confidential source of established reliability. The United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) reviewed the area of law concerning tips obtained from confidential informants and ensuing police actions. The court held it was wiser to abandon the "two-pronged test" established in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) (i.e., the informant's veracity, reliability, and his basis of knowledge), and, in its place, the court reaffirmed the "totality of the circumstances" analysis that traditionally had been used to determine if probable cause existed. However, see State v. Ruffin, supra, and State v. Raheem, supra, for a discussion of the Louisiana Supreme Court's restrictive view of Gates, supra.
In Ruffin and Raheem, our State Supreme Court concluded that while no longer controlling, the two-pronged test is a relevant and valuable consideration in applying the Gates test of the totality of the circumstances. If the second prong of the test is not met, the court appears to require some objective standard for the police officer to observe in addition to the informant's tip.
In the instant case, the officers testified that the confidential informant was of "established reliability," thus leading a reasonable man to believe that his veracity and information could be relied on. Although the informant did not expressly set forth the basis of his knowledge or how he knew that the defendant was involved with drugs, he contacted the police several days prior to the arrest and told them that, through his personal observations and experience with the defendant, he could identify the defendant by name. He told the police the defendant had previously made a trip to Fort Worth for the purpose of obtaining a wholesale quantity of Black Tar Heroin and would be doing so again; he also informed them that a female named "Miss Dick" would also be involved. On Friday, August 8, 1986, the informant again called the police and advised them that Geraci was either preparing to board a plane or had already left the city enroute to Fort Worth, Texas.
At that point, through independent police investigation, the officers made a computer check, which indicated that the defendant was a narcotics trafficker with several prior narcotics arrests, and that there was an outstanding warrant for the defendant's arrest for a theft charge in Jefferson Parish. Several airlines were then contacted by the police and representatives of Delta Airlines advised them that Mr. Geraci had reserved a seat on a flight to Fort Worth, but the reservation had been changed from the name of Stephen Geraci to one Brandon Schultz, and the tickets had been picked up. *559 The representatives were then shown a photograph of Geraci, whom they identified as the person who represented himself as Brandon Schultz and the individual who boarded the plane for Fort Worth.
A return reservation was made for Brandon Schultz that same evening. The officers conducted surveillance of that returning flight but Mr. Geraci did not return that night. However, the following morning the officers again watched incoming flights from the Fort Worth area and the defendant was observed arriving at the airport. At that point, the officers followed Geraci and Miss Dick to the exit door of the airport and detained them for questioning.
All aspects of the informant's tip turned out to be correct and all were corroborated by the officers. The observations and additional investigation of the officers further corroborated the confidential informant's tip and provided enough additional facts for this court to conclude that probable cause for arrest existed under the test of "totality of the circumstances" even considering the restrictive view imposed by the Louisiana Supreme Court.
Once the officers took the defendant to the detention room, Mr. Geraci voluntarily signed the consent form to search his bag. The police told the defendant that he need not comply with the search; however, they also made it clear to him that if he did not consent, he would be detained until a search warrant was prepared. In State v. Burks, 466 So.2d 681 (La.App. 5 Cir.1985) writ denied, 468 So.2d 1205 (La. 1985), this court stated:
While the circumstances surrounding the signing of the consent form could indicate subtle coercion by the arresting agents, it is equally likely that the defendant could have concluded that it was in his best interest to cooperate. The record portrays the defendant as intelligent, street-wise, and articulate. After carefully reviewing the record, we find the defendant freely and voluntarily consented to the search of his house in order to secure certain advantages, concluding that it was in his best interest to cooperate with the law enforcement authorites.
In the case under consideration, the above quoted situation seems equally true and we cannot say that the trial judge erred in believing the testimony of the officers over that of the defendant, thus finding that the defendant voluntarily consented to the search of his bag. Accordingly, we find that the trial judge did not err in refusing to grant defendant's motion to suppress the evidence in Case Number 87-KA-339 (86-2268). This assignment is without merit.
FactsCase Number 87-KA-341 (86-2416) R.S. 40:967Possession of Oxycodone
Detective William Grieff participated in the arrest of Stephen Geraci on May 27, 1986 for possession of oxycodone. At the suppression hearing, Detective Grieff testified as to the events surrounding the defendant's arrest:
I was advised by Agent Simone that he had received some information from a confidential informant[1] that a subject by the name of Bill would be coming into town and would be staying at the La Quinta Hotel on Causeway Boulevard in Metairie, and that he would be bringing in a large quantity of Dilaudid tablets, and that Stephen Geraci would be selling most of the tablets for the subject, Bill. He asked me would I assist him in the surveillance, because I was aware of Mr. Geraci through past narcotics investigations. So at approximately 5:00, or 5:15 or so, we proceeded out to the area to conduct our surveillance ... at the La Quinta Hotel, in the general area around Causeway and West Napoleon ...
At approximately 5:30 p.m., we observed William Mims, a subject later identified as William Mims, come from the area of the La Quinta Hotel and walk to the corner of 36th and Ridgelake, I *560 believe, where they met up with a subject in an old model Buick, who I recognized to be Stephen Geraci, alias Obart. Both subjects drove, after Mr. Geraci got into the vehicle with this other subject, they drove to the EXXON Service station located at the corner of Causeway Boulevard and West Napoleon, at which time I observed this older gentlemen and Mr. Geraci appear to be exchanging something in the car. They stayed approximately two or three minutes at that location at the EXXON, at which time the older gentleman got out of Mr. Geraci's car from the passenger's side with a roll of money in his hand. He then walked down the street, northbound, towards Fast Stoplike a Western Union thing counting this money in his hand the whole time. A couple of other agents assisting us attempted to continue the surveillance on Mr. Geraci; however, they lost him. This other subject, Mims, comes out of the Fast Stop and goes back into his hotel.
At approximately 7:00 p.m., continuing the surveillance, the subject, Mims, comes out of the hotel, again walks to the corner of West Napoleon and Ridgelake, at which time Mr. Geraci arrives. He gets into the car, and they drive off and continue to drive around the area of West Napoleon and Causeway ...
As they were riding in the car, they were talking to one another; hands were going back and forth. After about, I guess, two minutes of this, two or three minutes of this, the vehicle drove over in the back streets on the west side of Causeway and started heading towards Severn. They then turned on Severn at which time, in the 2300 block, I believe, Officer Simone and myself decided we would stop the vehicle.
Upon stopping the vehicle, Agent Simone removed one person from the vehicle, who was identified as William Mims, and spoke with him while I got Mr. Geraci out the car and spoke with him, at which time I advised him of his rights, advised him of the ongoing narcotics investigation, at which time Mr. Geraci agreed that he would give me a consent for his residence. [footnote[2]] Prior to getting the consent, he also agreed to accompany us over to the La Quinta Hotel, where Agent Simone had gotten a consent from William Mims for his hotel room.
We went over to the hotel room. Agent Simone executed his consent on the hotel room [footnote[3]], at which time Mr. Geraci signed, after being advised of his rights, again, and I read him the consent to search form and advised him if he wanted to he didn't have to sign it. He kept expressing a willingness to cooperate. He said: `I have nothing at my house. I will be glad to give you the consent.' He signed it, and we went to his residence on Neyrey Drive and executed the consent, at which time we found, I believe it was, eleven grams of marijuana and one Tylox capsule, which contains oxycodone ...
The capsule and the marijuana were in the top dresser drawer in Mr. Geraci's bedroom.
The defendant, Stephen Geraci, also testified at the suppression hearing quite differently as to the circumstances surrounding his arrest. The defendant testified that the officers surrounded the car (approximately four officers on each side) and dragged him and his companion out of the car while it was still rolling. The officers then proceeded to search the car and the two subjects. The defendant further testified that he never felt that he was free to *561 leave because they handcuffed him at the scene of the stop, and that he felt that he was under arrest from the point that he was dragged from the car. The defendant admitted signing the consent form; however, he stated that he did so because the officers told him "Sign this, or we're going to come in and search your house and tear it up." The defendant additionally admitted that the officer explained the consent form to him before he signed it and also told him that he had a right not to consent, but that if he did not sign it, the officer would obtain a search warrant.
Obviously, the trial judge believed the factual version of the officers as he denied the motion to suppress.
Defendant again only presents one assignment of error:
1. The trial court erred in denying the Motion to Suppress the Evidence.
Assignment of Error No. 1Case Number 86-2416
Defendant contends that his consent was not valid as it was tainted by an illegal arrest. In this case, Mr. Geraci classifies his initial stop as an arrest. However, the testimony of the police officers indicate that the defendant was not arrested until after his residence was searched and narcotics were seized.
Only a reasonable suspicion of criminal activity is needed to justify an investigatory stop pursuant to LSA-C.Cr.P. Art. 215.1(A). Reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case. In determining whether reasonable cause exists for the stop, the totality of the circumstances must be considered. State v. Belton, 441 So.2d 1195 (La.1983); Cert. denied Belton v. Louisiana, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984); State v. Bearden, 449 So.2d 1109 (La.App. 2 Cir.1984) writ den. 452 So.2d 179 (La.1984). As we have stated above previously, police officers are vested with the right to make an investigatory stop of an individual if he reasonably suspects that the person is involved in criminal activity.
It is now well recognized that an informant's tip can provide police officers with reasonable suspicion to make an investigatory stop. State v. Wilson, 366 So.2d 1328 (La.1978); State v. Sims, 350 So.2d 1189 (La.1977).
In determining whether reasonable cause exists, we must utilize the "same criteria of trustworthiness required for the showing of the greater degree of probability of criminal conduct necessary to justify an arrest." State v. Wilson, supra. Thus, in either situation, the reliability of both the informant and his information must be satisfactorily demonstrated, or, if the tip is inadequate, it may be deemed sufficiently trustworthy on the basis of corroboration by independent sources. State v. Ruffin, supra; State v. Raheem, supra.
In the instant case, a confidential informant of proven reliability (as established by the testimony of Agent Simone, supra) informed the police that "Bill" would be coming into town with a large quantity of Dilaudid tablets, and that Mr. Geraci would be selling most of the tablets for "Bill."
Pursuant to the tip, police set up surveillance at the La Quinta Hotel in Metairie at approximately 5:00 p.m., the place that "Bill" would be staying while in town. At about 5:30 p.m., the police observed William Mims come from the area of the hotel, walk to the corner of 36th and Ridgelake, where he met Stephen Geraci. Detective Grieff, who participated in the surveillance, was familiar with the defendant through past narcotics investigations.
The two got into a vehicle and drove to the Exxon Service Station at Causeway Boulevard and West Napoleon. Staying there for approximately two or three minutes, the two seemed to be exchanging something in the car. When Mims exited the defendant's car, he had a roll of money in his hand, and was counting it as he walked, making this observation by the officers unmistakable.
At this time, the agents lost the surveillance of the defendant; however, the surveillance continued at the hotel room. At *562 about 7:00 p.m., the police again observed Mims walk to West Napoleon and Ridgelake, where he met the defendant. They again got into a vehicle and began driving around. As they were riding in the car, the police observed the subjects talking, in addition to hands going back and forth, mannerisms which are consistent with drug transactions. After approximately two or three minutes of this, the officers stopped the vehicle.
All of the above factors indicate that the investigatory stop of the defendant was justified based on reasonable suspicion of criminal activity.
According to the officers, after the initial stop, the defendant was free to leave; however, he instead indicated a willingness to cooperate by consenting to the search of his residence. He also agreed to accompany the officers to La Quinta Hotel to search Mims' room, pursuant to Mims' consent, which consent was not traversed by the defendant. However, even if the defendant had not consented, the officers had the authority to detain the defendant within the purview of Art. 215.1 so as to preclude any possible destruction of evidence.
In State v. Cathey, 493 So.2d 842 (La. App. 5 Cir.1986), writ den. 500 So.2d 419 (La.1987), agents were dispatched to the defendant's apartment to secure the premises prior to the arrival of the defendant and the police officers. The agents were dispatched to the apartment when Ms. Nolan failed to arrive for questioning, fearing that she was enroute to the apartment to destroy the evidence. In Cathey, supra, at 850, this Court stated:
In State v. Bearden, supra, this Court approved of a warrantless seizure to protect the evidence.
[the officers] had reasonable grounds to believe that if they had not taken swift action the contraband could have been moved and/or destroyed, and the supplier could have eluded prosecution. See United States v. Thompson, [700 F.2d 944, 950 (5 Cir.1983)].
The officers were prudent and had reasonable cause to act as they did in view of the knowledge they already possessed and the circumstances presented to them. Therefore, we find that the seizure of the Arroyo residence (and even its search, if such had been the case) without a warrant was justified and legally valid. 449 So.2d at 1119.
It is well established that "inherent in the officer's right to stop a suspect and demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or available to the officers or to obtain information independently from his cooperation. State v. Fauria, 393 So.2d 688 (La. 1981)." State v. Diaz, 461 So.2d 1099 (La. App. 5 Cir.1984).
As the officers made a valid investigatory stop of the present defendant, it was within their authority to detain the defendant, so as to verify the information given to them by the confidential informant. Although no drugs were found in the car, based on the information within the officers' knowledge at the time of the stop, it was probable that a large quantity of narcotics was in Mims' hotel room and possibly even in defendant's residence, as he was supposed to be doing much of the selling. Had the police allowed either of the two suspects to leave, it is likely that any possible evidence would have been destroyed. Therefore, even if defendant had not consented to go to the hotel room, the officers still had the authority to detain him, while acting on the information.
According to the officers, at the time of the stop, Mr. Geraci orally consented to the search of his residence and Mims agreed to the search of his hotel room. Indicating a willingness to cooperate, the defendant was transported by the officers to the hotel room, as that was deemed to be the most pressing place to search. It appears that after the consent to search the hotel room was executed (the search revealed the presence of Dilaudid tablets) the defendant formally executed a consent to search his residence by signing the form, after being advised of his rights. Defendant was additionally advised that if he did not want to consent, he did not have to. *563 Considering that narcotics had just been found in the hotel room, it is logical to believe that the defendant may well have felt that it would be in his best interest to cooperate at that point. See State v. Burks, supra.
The law is extremely well-settled that, where there is contradictory testimony, the trial judge's evaluation of credibility is entitled to great weight. State v. Bearden, supra. The trial judge chose to believe the testimony of the officers, rather than that of Mr. Geraci. Considering all of the circumstances, we find there is no basis to disturb his credibility call in this case. We find, therefore, that the defendant's consent was freely given and was not the result of an illegal arrest.
Accordingly, we find that the trial judge did not err in refusing to grant defendant's Motion to Suppress the Evidence in Case Number 86-2416.
For the foregoing reasons, the convictions of both case No. 86-2268 and Case No. 86-2416 are affirmed.
AFFIRMED.
NOTES
[1] Agent Simone's testimony at the trial established beyond doubt the reliability of his confidential informant stating that previous information from this informant had resulted in the arrest of individuals and the seizure of narcotics (in which he had participated) on numerous occasions.
[2] Officer Grieff testified that after the suspects were ordered out of the vehicle, they were patted down for weapons, and told to keep their hands on the vehicle so any potential evidence could not be destroyed. The officer testified that his gun was drawn at the time of the stop, but "as soon as the dangers had passed, and the subject had stepped from the vehicle, my weapon was placed back in my waistband." The officer also testified that when he first stopped defendant, he was not under arrest, and further that defendant was free to leave, but instead agreed to cooperate by consenting to the search of his residence.
[3] Dilaudid tablets were seized from the hotel room.